UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| | ) | |
| Scott and Rhonda Maki, on behalf of their minor child, C.K.M., | ) ) ) | Civil File No. |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Complaint |
| Minnesota State High School League, and Craig Perry, individually and in his official capacity, | ) ) ) ) | |
| Defendants. | ) ) ) | |

For their Complaint, Plaintiffs Scott and Rhonda Maki, on behalf of their minor child,

C.K.M. ("Makis" or "Plaintiffs") states against Minnesota State High School League ("League")

and Craig Perry ("Perry"), in his individual and official capacity the following:

# I.   Preliminary Statement

1.      This is an action for injunctive relief, declaratory relief, and money damages arising out

of the injury and damage sustained by C.K.M. as a result of the unconstitutional vagueness and

arbitrary application of the League Bylaws. Plaintiffs seek relief from Defendants for improperly

denying C.K.M., a student, transfer eligibility for varsity athletics based on intolerable conditions

in her resident school. Under Minnesota law, varsity eligibility is a constitutionally protected

property right, part and parcel of a student's right to an education, and which cannot be taken

away without due process.  Due to the closed, overly-restrictive, incomplete, harsh and arbitrary

application of the Bylaws by the Defendants, C.K.M. was denied a constitutionally protected

right without due process. Given that the Defendants are non-profit corporation, not an

administrative body, under Minnesota law.  The League, which receives substantial pecuniary

gain from member schools, taxpayers and participating students, is not governed by neutral, fair

1

or published hearing rules such as the Minnesota Administrative Procedure Act ("APA").

Consequently, the actions and Bylaws of the League should be accorded no deference by this

Court.

2.        Plaintiffs seek not only money damages but also to obtain a temporary restraining order

preventing Defendants from denying C.K.M. eligibility for varsity sports, a permanent injunction

preventing Defendants from denying C.K.M. eligibility for varsity sports, for a declaration

Defendants' Bylaws are vague and do not afford students legitimate due process and are,

therefore, unconstitutional, for a declaration that Defendants arbitrarily and capriciously apply its

Bylaws, violating C.K.M. and other students' constitutionally protected rights.  Plaintiffs' further

seek a declaration that Defendants are not an administrative body for which the application of the

Bylaws by the Defendants should be afforded any deference by this Court.

3.        C.K.M. is a talented and hard-working athlete.  Prior to Makis' move to Cokato from

Bettendorf, Iowa for C.K.M's 8th grade, C.K.M. excelled in the sports of basketball, volleyball

and softball.  Her hard work and accomplishments, and the hard work and accomplishments of

teammates were celebrated by her coaches, teammates, community and family.

4.        C.K.M. is an exemplary high school junior attending Maple Lake High School ("Maple

Lake") after she transferred from her resident school, Dassel-Cokato High School ("DC").  She

is a gifted athlete eligible for varsity sports in basketball, volleyball and softball.  C.K.M. was

transferred in October of her junior year because of the unprofessional conduct of a DC coach

and the significant adverse effect that conduct had on C.K.M.  As the Makis attempted to work

out the conditions with DC school officials, the conditions became more intolerable and hostile,

expanding to include other coaching staff and members of the Maki family.

## II.   JURISDICTION

5.      Plaintiffs bring this action pursuant to 42 U.S.C §§ 1983 and 1988, the Fourteenth

Amendment to the United States Constitution, 28 U.S.C. §§ 1331 and 1343, and 28 U.S.C. §

1367. This Court has original jurisdiction over Count One and supplemental jurisdiction over

Counts Two through Four.

6.      Venue in this District is authorized by 28 U.S.C. § 1391 (b) because the League and

Defendant Perry conduct business or reside in this District and because this District is where a

substantial part of the events or omissions giving rise to the claims occurred.

## III.   PARTIES

7.      Plaintiffs Scott and Rhonda Maki ("Makis") are the parents and natural guardians of the

minor student athlete, C.K.M.  The Makis resides in the Dassell-Cokato Public School District.

8.      Plaintiff C.K.M. is a student athlete eligible to participate in the varsity sports of

basketball, softball and volleyball.  C.K.M. has been as dedicated to her athletic performance as

she has to her academic performance.

9.      Defendant Minnesota State High School League ("League") is a non-profit association of

high schools in Minnesota governing the participation in extracurricular activities for its member

schools. Minn. Stat. § 128C.05.[1]  The League is a state actor when it administers high school

student eligibility determinations.

10.      Defendant Craig Perry ("Perry") is a party in his individual and representative capacity as

the Associate Director of the League. Perry acted as an agent or employee of the League at all

---

[1] The League is a domestic non-profit corporation formed under Minn. Stat. § 317A, File Number D-416 with a filing date of May 27, 1960 with the Minnesota Secretary of State, with a registered place of business at 2100 Freeway Boulevard, Brooklyn Center, Minnesota 55430.

relevant times and under the color of state law. On information and belief Perry is a resident of the State of Minnesota. Perry was responsible, in part or in whole, for barring C.K.M. from participation in varsity athletics, which then precipitated an internal League decision on the matter which resulted in C.K.M. being determined ineligible from varsity athletics for 365 days from the date of enrollment. Perry's determination that C.K.M. was ineligible was in violation of state law, unconstitutionally deprived C.K.M. of a property right without due process, which adversely affected C.K.M. and her family.

## IV.   FACTS

11.      C.K.M. is seventeen year old junior attending Maple Lake Public Schools ("Receiving School") through open-enrollment.  She is a dedicated student and athlete.  During her freshman year at Dassel-Cokato Public Schools ("Sending School') she attained the A and B honor roll and received a Varsity Letter in Softball.  Calli was named "All-Conference" in Softball and made the "All Area Team." C.K.M. continued on the A and B honor roll her sophomore year and received a Varsity Letter in Basketball, Volleyball and Softball.  She was again named "All Conference" in Softball and she achieved the All Section Team, and received the Honorable Mention All-State Team.  During her junior year, she was inducted into the National Honor Society.

12.      The Maki family transferred from Bettendorf, Iowa in August 2013 to Cokato, Minnesota when Mr. Maki was hired as vice-president of a manufacturing firm in the area.  C.K.M. began school at Dassel-Cokato ("Sending School") for her eighth grade.  The initial move was a difficult transition for the family.  When they first moved to Cokato, their home was repeatedly and persistently egged over several months.  The family mailbox was also repeatedly destroyed.

Nevertheless, the Makis stayed and their children began to form friendships and positive

relationships with their class mates, teachers and coaches.

13.     C.K.M. experienced what began as a difficult relationship with her varsity basketball

coach for her freshman year, Derek Levno ("Levno").   She had always had very positive

experiences with her coaches and teachers.  *See References,* Exhibit No. 1.  In C.K.M.'s

sophomore year, she began to report to her parents that Levno was singling her out for discipline

that included shouting, yelling, making negative remarks, challenging her athletics and

leadership by persistently asserting that she was not a team player or a team leader.  Levno

consistently alleged that C.K.M. had an "attitude problem".  These remarks by Levno were made

over a period of months and directed at C.K.M., to the exclusion of other team members.  At a

later period, Levno would tweet out the same criticisms that targeted C.K.M., asserting the

tweets were remarks to the team in general.  Levno, C.K.M. and her teammates knew that the

tweets were targeted at C.K.M. because the tweets repeated one of the same criticisms Levno had

directed at C.K.M. the entire season.  C.K.M.'s teammates began making the same remarks and

ostracized her as a member of the team.

14.     Levno also insisted that C.K.M. meet with him privately to go over her perfromance after

each game.  In those meetings, Levno would point out each mistake that C.K.M. made during the

game.  Levno did not do this with other athletes.  As a result of Levno's negative remarks,

persistent criticism and private meetings, C.K.M. was questioned repeatedly by her teammates

about what was happening.  At this time, C.K.M.'s teammates began to persistently criticize her

"attitude" and insist that she "smile" during games.  It became a joke that was repeated among

her peers.

15.     The Makis asked for assistance from Dassel-Cokato school administrators because

C.K.M. felt bullied by Levno.  Dassel-Cokato adopted the following policy:

> "[T]o the extent [bullying][2] affects the educational environment of the school district and
> the rights and welfare of its students and is within the control of the school district in its
> normal operations, the school district intends to prevent bullying and to take action to
> investigate, respond to, and to remediate and discipline for those acts of bullying which
> have not been successfully prevented. The purpose of this policy is to assist the school
> district in its goal of preventing and responding to acts of bullying, intimidation, violence,
> reprisal, retaliation, and other similar disruptive and detrimental behavior.

*DC Policy No. 514*, III. Exhibit No. 2.

16.     Dassel-Cokato also adopted a procedure for reporting bullying.  Complaints are to be

made to the building principal, the principal's designee or building supervisor.  *Id*. at *DC Policy*

*No. 514*, IV.  Dassel-Cokato directs student and families to contact school administrators to

initiate an investigation.  According to the policy, the administration is to investigate within three

days and, upon completing the investigation, undertake remedial action including discipline. *Id.*

at *DC Policy No. 514*, V.

17.     Consistent with Dassel-Cokato's anti-bullying policy, the Makis first encouraged C.K.M.

to speak to the coach and the administration regarding her concerns.  After an unsuccessful effort

to speak with Levno regarding her concerns, Mrs. Maki then called the Sending School

administration, on December 23, 2015 to address C.K.M.'s concerns.  The family scheduled a

meeting with Mr. Levno and Perry Thinesen, Athletic Director for January 6, 2016.  During the

meeting, Levno became angry and began to berate C.K.M. asserting that she had to "get on board

with the program or quit."  C.K.M. tried to raise her concern that his remarks were being

---

[2] "Bullying" according to the Sending School means "intimidating, threatening, abusive, or harming conduct that is
objectively offensive and: 1. an actual or perceived imbalance of power exists between the student  engaging in the
prohibited conduct and the target of the prohibited conduct, and the conduct is repeated or forms a pattern; or  2.
materially and substantially interferes with a student's educational opportunities or performance or ability to
participate in school functions or activities or receive school benefits, services, or privileges.

repeated by her team mates and that she was being ostracized. Levno asserted that the conduct of his players was not his responsibility. Her parents attempted to intervene when C.K.M. began to cry. Thinesen brought the meeting to a halt. As Levno left the meeting, he continued to berate C.M.K. stating that he was sorry he ever let her start, play on the team or be a leader on the team. He also stated that he would not change his behavior toward her.

18.     After the meeting, Levno immediately removed C.K.M. from her starting position and put her on the bench. Scott Maki once again spoke with Perry Thinesen and their concern that Levno was retaliating against C.K.M. Thinesen agreed to look into the concern but concluded that no emotional abuse or bullying had taken place. No investigation into the concerns was undertaken.

19.     As the situation continued and became more damaging, the Makis contacted Defendant Perry on March 31, 2016 about transfer eligibility under the "intolerable conditions" exception. Defendant Perry declined to speak with the Makis and instead referred the family to the Minnesota State High School League website and Bylaws. The Makis have never received a copy of their due process and hearing rights consistent with Bylaw 300.

20.     In April 2016, C.K.M. was informed that in a closed team meeting, to which she was neither invited nor attended, Levno disclosed to C.K.M.'s teammates the contents of the meeting between the Makis, C.K.M., Levno and Thinesen. Levno also disclosed to C.K.M.'s teammates that all of the basketball coaches were refusing to coach C.K.M. her next school year.

21.     Plaintiffs again approached Perry Thinesen to discuss their concerns regarding Levno's disclosures and asked that Thinesen investigate the disclosures and statements. Thinesen did initiate an investigation into whether Levno violated C.K.M.'s privacy rights through the disclosure. Thinesen declined to investigate Levno's prior conduct or whether this disclosure

was in retaliation for raising their concerns regarding Levno to the administration. Shortly after Thinesen initiated the investigation, Levno resigned as the girls' basketball coach. Levno continued as a teacher and coach in other athletic programs at Dassel-Cokato.

22.     The Makis met with Thinesen and Superintendent Jeff Powers regarding the disclosure investigation.  At the meeting, the Makis were informed by Superintendent Powers that Levno may have been fired over the disclosure but since he resigned from the girls' basketball coach, the investigation would be dropped. The Makis questioned whether the policy was being followed and asked to provide correspondence setting forth their concerns regarding Levno to be kept for future students who may be confronted with similar conduct.  The Makis expressed their concerned that no remedial action had been taken by Dassel-Cokato administrators.  The Makis also asked that Thinesen and Powers to address social media tweets by Levno that were targeted toward C.K.M.  Powers became confrontational and angry over the Makis requests and the meeting was ended.

23.     After the meeting with Thinesen and Powers, the Makis continued to advocate for C.K.M. by contacting the sending school's board of education and other state agencies regarding public school's obligations to prevent bullying and follow its board policies and procedures.  The board of education declined to respond and informed the Makis that the board does not address such situations.  Thereafter, the Makis filed a formal complaint regarding Dassel-Cokato administrators with the Board of School Administrators ("BOSA").

24.     C.K.M. continued to be ostracized by her basketball team mates but she tried to put the situation behind her and begin her junior year. She joined volleyball team for her junior year in late August 2016.  She was appointed the Libero position, which is a position in which the

strongest defensive player is placed.  At the beginning of the season, C.K.M. was approached by a volleyball coach who was surprised and pleased by C.K.M.'s "attitude".

25.     On September 20, the captain of the volleyball team, also a member of C.K.M's basketball team, held a meeting without coaches present.  The purported purpose of the meeting was to discuss an "attitude problem" on the team.  C.K.M. was shocked and concerned that the issues from basketball were impacting her volleyball team, as well.  On September 24, 2016, the captain approached C.K.M. during a game to scream and yell at her in front of her teammates about how negative and inappropriate she was as a player and leader.  The other teammates joined in to criticize her.  When C.K.M. approached the coach, the coach told her that she needed to apologize to the entire team.  That demand for an apology was later rescinded but the allegations of C.K.M.'s having a poor attitude persisted and her teammates began to routinely criticize her by yelling out "attitude" on the court and demanding that she smile.  Her teammates at this time were not permitting her to join team huddles.

26.     The basketball teammates were also becoming intentionally and physically aggressive toward C.K.M. on the court.  In one instance her eye was blackened by a teammate.  Her teammates began persistently telling her she was not a member of the team.

27.     On September 29, 2016, the coaches had a meeting with the volleyball team.  The purpose of the meeting was to discuss the "negative attitude" that had infected the team but without any specifics.  On October 3, 2016, C.K.M. was removed from the Libero position and put on the bench.  She was not permitted to play even when the "substitutes" where permitted to play.  No other students on the team was disciplined or demoted to the bench.

28.     Once again C.K.M. attempted to address the changes with the coach and assistant coach in a private meeting.  The coach and assistant coach stated that she was not in trouble but that she

was being removed from the position because of her attitude, her emotional disconnect and team

chemistry.  Both coaches asserted that C.K.M. "played only for her own glory" which was not

good for the team.

29.     After one volleyball game, Mr. Maki approached the assistant coach, Linda Resop, to

sign out C.K.M. for transportation home because she was very distraught and crying.  When the

coach handed Mr. Maki the clipboard to sign, he asked whether the coaches had stated to C.K.M.

that she only played for her own glory.  Ms. Resop stepped near Mr. Maki and stated "Yes, I did

say that and that is what I believe."   Ms. Resop appeared to be angry with Mr. Maki.  The

following week, Mr. Maki received a telephone message from the head volleyball coach, Megan

Chatterton, asserting that Mr. Maki physically assaulted Ms. Resop.  It was an outrageous and

demonstrably false assertion.  Mr. Maki was required to defend against false allegation with

Dassel-Cokato's administration.  The allegations were subsequently dropped.

30.     After Calli began to experience the same issues in with her volleyball coaches and

teammates that she experienced in basketball, she became more deeply distressed at the

circumstances.  She was permitted playing time but her concern was what was happening during

and outside of court time. She expressed that there was no reasonable way to handle the situation

and that she may as well commit suicide rather than fight what was happening to her.  When

Mrs. Maki repeated C.K.M.'s statement and asked for help from the volleyball coach, the coach

remarked that "[C.K.M.] should quit if she can't handle the circumstances".  The coach

mischaracterized the Plaintiffs' concerns as only about playing time and nothing else.

31.     After C.K.M. made the remark, the Makis took her to see a sports and clinical therapist

for evaluation and recommendations. C.K.M. began attending therapy to address her anxiety,

depression and stressors.[3] On October 25, 2016, Alexandra L. Wagener, Ph.D. and L.P. wrote to the receiving school, Maple Lake and the League endorsing C.K.M.'s transfer and the basis for the transfer:

> [C.K.M.] and her mother reported an unstable and unhealthy school and athletic environment with poor treatment including but not limited to bullying and retaliation from coaches, athletic administration and peers.  In my clinical opinion, it appears Ms. Maki's conditions at her former school have affected her mood, confidence in sports, self-worth, trust of others, and overall sense of self.  The use of athletics to promote growth and inspire healthy competition within our youth was not met at her current school.  Continuing to stay at her current school with little to no change from adults, coaches, supervisors around her poses risk for more severe mental health concerns to develop and decreases the likelihood of promoting overall health and well-being.

*Wegener Report*, October 25, 2016.  Exhibit No. 3.

32.     By transferring from the Sending School to the Receiving School, C.K.M. recognized that she would be playing in a high school conference that was ranked lower than her sending school.

33.     Mr. Maki again contacted the League prior to C.K.M.'s move to discuss the "intolerable conditions" clause in the League's Bylaws.  Defendant Perry declined to speak with him citing his position on appeal committee.  No other League person was available to discuss the Bylaws or the intolerable conditions exemption with the Makis.  The Board Policy Definitions does not provide a definition for intolerable conditions.

34.     Once C.K.M. had been transferred to Maple Lake Public Schools, Tim Tungseth, Activities Director, initiated the transfer request with the League.  Tungseth informed the Makis that the transfer request had to be appealed and that the receiving school was unable to agree, under the League Bylaws, to C.K.M.'s transfer eligibility.  Exhibit No. 5.  No denial of the transfer eligibility was received by the Makis and no due process League Bylaws were provided

---

[3] Dr. Wagener diagnosed C.K.M. with Adjustment Disorder with Mixed Anxiety and Depressed Mood.

to them. In a telephone call, Tungseth discussed with the Makis what materials would be needed for the appeal. The Makis responded with electronic emails starting October 24, 2016 through October 28, 2016 providing Tungseth with all of the materials requested. Tungseth and the Makis worked cooperatively together thereafter until October 31, 2016 making sure that all of the information regarding the appeal was correct and available. The documentation submitted to the League included the following:

1. Cover letter to the League from the Makis;
2. Dr. Wagener report;
3. Three (3) letters of support for transfer eligibility from three former coaches: Brian Badenhoff, Hannah Klug, and Julie Shelhaug; and
4. The complaint to BOSA.

Exhibit No. 1.

35.     Once the appeal was submitted, Thinesen from Dassel-Cokato asked Tungseth for a copy of all the materials the Makis submitted in support of C.K.M.'s transfer eligibility. The Makis objected to providing the private therapist's letter to Thinesen at the offending school. However, according to Tungseth, Defendant Perry stated that unless all of the materials were sent to the offending school no League appeal would be granted. The Makis were not permitted to speak directly with anyone from the League regarding the request and appeal. Tungseth sent the Makis' materials to Thinesen providing Daseel Cokato with all of the documents with the exception of the therapist's report.

36.     On November 9, 2016, the Makis received from Tungseth the electronic correspondence from the League denying the appeal. It was the first opportunity for the Makis to see what the sending school said about the transfer eligibility request. Mr. Maki asked Tungseth whether the Makis could respond to the sending schools allegations that mischaracterized the Makis as impossible, difficult sport parents demanding playing time for their child. On November 15,

2016 Tungseth contacted Defendant Perry to determine whether the appeal would be accepted.
On November 22, Tungseth once again contacted Defendant Perry who responded that the Makis
would be required to pursue the appeal through the League's hearing procedure.  The Makis did
not request a hearing and had not received any basis for the denial of C.K.M.'s transfer
eligibility.  The League requested a hearing.  At that time, the League scheduled the hearing the
Makis were in the process of responding to Dassel-Cokato facts. The Makis were not provided
any notice or Bylaws from the League or any public school.  On October 28, 2016, after the
Makis went through the considerable expense to retain counsel and a formal request to the
League's counsel, the records from the League regarding C.K.M.'s eligibility were provided.
League counsel, however, declined to provide copies of the League's decisions.  The information
provided by the League's counsel once again did not include the Bylaws or hearing rights.  It
also had additional information regarding the transfer request and internal appeal within the
League.  But for retention of counsel and a formal data request, the Makis would have had to
appear in a due process hearing with none of the materials related to the League's decision.

37.     According to the League Bylaws, transfer eligibility will not be considered by
Defendants until after the transfer has taken place and the student has attempted to play for the
receiving school.  Once the transfer is made, the student is determined ineligible but may request
eligibility through the athletics department at the receiving school.

38.     According to the League, there is a rebuttal presumption that a transfer student is
ineligible to play varsity sports.  The presumption of ineligibility can be rebutted through
specifically identified exemptions.  The Makis sought the intolerable conditions exemption,
which required a student to comply with the mandates set forth in the exemption:

> Intolerable conditions at the Sending School as affirmed in writing by the Sending
> School. When situations arise that the student or parents believe have created an

intolerable condition, the acts complained of must first be reported to the appropriate administrators at the school so they have the opportunity to investigate and take any action they deem necessary to resolve the problem. If the parents believe that actions or situations are occurring that have an adverse impact on the physical or psychological well-being of the student, the student must have been referred to an appropriate medical or psychological professional. That professional must prepare a written report that can be provided, on a confidential basis, to the school, the League office and the independent hearing officer if a hearing is required. If police action has been taken, copies of the reports showing that an investigation was actually conducted and the results of that investigation must be provided. In general, allegations alone are not sufficient. There must be some reasonable and believable substantiation presented to indicate an incident or incidents actually occurred. As well, the perpetrators must be identified.

Exhibit No. 4, League Bylaw 111.1(D): *Policy Procedures for Determining Transfer Student Eligibility*.  Accordingly, a student must meet the following burden:

1.  A sending school must affirm the intolerable conditions;
2.  The intolerable conditions must be reported by the student or parents to the sending school administration providing the sending school with an opportunity to investigate;
3.  A confidential medical or psychological professional report;
4.  Presentation of substantial information of the intolerable conditions; and
5.  Disclosure of the perpetrators of the conditions.

39.     The Makis complied, to the extent that they were able, with each exemption requirement.

Exhibit No. 1.   Because the intolerable conditions existed as a result of the sending school's adverse actions against C.K.M., unsurprisingly, the sending school responded to the request for the intolerable conditions exemption with misinformation that appeared in a concerted effort to minimize their responsibility and mischaracterize the Makis as difficult and demanding sports parents primarily focused on C.K.M.'s playing time[4].  Exhibit No. 1.  In the document entitled Appeal Response sent on November 9, 2016, Dassel-Cokato responded "Dassel-Cokato is not interested in standing in the way of Calli becoming eligible for varsity athletics at Maple Lake. However, we do not agree that there were intolerable conditions for [C.K.M.] at DC." *Id.*

---

[4]    The Makis had, by this time, filed a formal complaint with BOSA against the sending school's administrators.

40.    According to the League Bylaws, a student may "contest a school's failure to certify the

eligibility of the student".  In this case, there was no school action denying C.K.M. her eligibility

under the intolerable conditions exemption.  Both the receiving and sending school agreed that

C.K.M. should be granted transfer eligibility. Exhibit No. 6.

41.    The League provides domestic transfer students challenging an initial transfer eligibility

determination with the following due process statement:

> The Minnesota State High School League Board of Directors has established a due
> process procedure for a student or parent who believes the bylaws of the League have
> been misinterpreted by the student's school administrator(s) who are charged by the
> school to determine the student's eligibility. A student who represents the student's
> school in competition between member schools at the varsity, junior varsity or
> sophomore B-squad level must be fully eligible to do so, and the student or the student's
> parents who wish to contest a school's failure to certify the eligibility of a student may do
> so as identified in the Transfer Eligibility Appeal Procedure found on page 25 of the most
> current League Official Handbook.

Exhibit No.  4, *League Rule* 111.1(G).  The process identified and practiced by the League is

insufficient due process to protect the education rights of student athletes.  The Bylaws in their

application by the League are arbitrary and capricious, overly restrictive, harsh and punitive for

students with legitimate reasons for a transfer eligibility.  According to the League and its

determinations related to this case, C.K.M. lost her right to participate in varsity athletics because

she left her resident district as a result of misconduct by the coaches and school officials.

Evidently, in order to preserve her right to participate in varsity sports, for which she has worked

her lifetime, she would have had to remain at the offending school.  C.K.M. had to sacrifice her

friendships with peers, teachers and coaches to transfer to Maple Lake.  She moved from a AA

conference sports team to the smaller A conference.  In making that sacrifice to address the

intolerable conditions at Dassel-Cokato, C.K.M. risked losing varsity eligibility and all the

benefits attendant on her hard work. The goal of the League in reducing student athlete transfers

for sport team purposes is not met by denying all requests for eligibility transfer outright and by
requiring students to participate in a procedurally flawed, vague and arbitrary, and time
consuming appeal process under the League Bylaws.

42.    The Makis submitted C.K.M.'s transfer eligibility request at the time she transferred from
Dassel-Cokato High School to Maple Lake High School.   Both the Sending and Receiving
schools agreed to C.K.M's eligibility transfer. *See*, Exhibit No. 6.  The request included a
narrative of the events with C.K.M. along with all of the electronic correspondence between the
Makis and the sending school employees. *Id*. The Makis documentation showed that they had
requested an investigation from the sending school, Dassel-Cokato, and that the investigation had
been dropped by the administration.  The documents further showed that the Makis had
attempted to speak with the sending school board or education and superintendent.

43.    Despite submitting all the information available to the Makis, the League denied the
appeal on November 9, 2016 citing that "[t]he documents submitted for review in support of the
family's rationale for the transfer eligibility do not demonstrate intolerable conditions existed at
Dassel-Cokato."  The League determination did not identify the author, the date or the basis
upon which it was made. Ex. 1.

44.    The Makis attempted to respond and clarify the allegations made by Dassel-Cokato.  On
November 23, 2016, the Maki family was informed that a League hearing regarding C.K.M.'s
transfer eligibility had been scheduled for the morning of November 29th.  The notification of the
hearing came orally from the sending school.  No documents were received from the League
indicating the date, time and location for the hearing, the individual appointed to hearing the
matter, or identifying any rights the Makis had in the League hearing.

45.     The appeal process Defendants purport complies with students' due process rights has no

Minnesota state statute or rule outlining its obligations.  Defendants are not bound by the

Minnesota Administrative Procedures Act.

46.     Defendants hearing and appeal process is not constitutionally sound. The Transfer

Eligibility Appeal Process the League has created is an obstacle to the protection of an athletes

rights.  Exhibit No. 4, *League Bylaw 111*, p. 25.  According to the process, the sending school

will make an initial transfer eligibility determination which the League reviews.  The League is

to respond agreeing or disagreeing with the initial transfer eligibility determination.  No such

initial determination was made in this instance and the Makis have not received any

documentation from the League indicating it agreed or disagreed with an initial transfer

eligibility determination.  Maple Lake does not believe it is to make the initial transfer eligibility

determination.  Exhibit No. 6.  The League policies then permit a student to appeal "the

Receiving School's initial transfer eligibility determination" to the League.  Exhibit No. 4, p. 25,

*League Bylaw* 111.3(C).  The receiving school is then to submit the appeal, which can be granted

or denied.  *Id.*, *League Bylaw* 111.3(D).  If the appeal is denied, the student may request a

hearing.  *Id*.  The request for a hearing must be in writing, providing a rationale for why a

hearing should be held, and provide supporting documentation.  *Id*. at 111.3(F).  The Makis have

never submitted any request for a hearing in writing and were surprised when a hearing was

scheduled the day before the Thanksgiving holiday for the morning of the following Tuesday.

47.     In the event that a request for an independent hearing is received by the League, the

League can either grant or deny the hearing.  If a hearing is denied, a student may seek relief

from the League Board of Directors at its next regularly scheduled meeting.  Finally, the League

Bylaws assert that the transfer eligibility decisions are final and without no other recourse.

17

48.     The Appeal Process is unnecessarily confusing, laborious, and time consuming for the student seeking the exemption.  According to the League Bylaws, no student has an entitlement to a hearing during the process.

49.     The Plaintiffs have made data requests related to Defendants' hearing process. Minn. Stat. § 128C.17.  Specifically, Plaintiffs have requested access to Defendants' prior decisions related to transfer eligibility. Exhibit No. 7.  Defendants have not provided the prior decisions. Exhibit No. 8.

50.     The Minnesota Department of Education's 2016 audit of Defendants hearing decisions reflected that not one of the eight students who proceeded to a League hearings for transfer eligibility was granted eligibility status.  Exhibit No. 7.

## IV.   CLAIMS

### COUNT ONE

### 42 U.S.C. § 1983-FOURTEENTH AMENDMENT VIOLATIONS
### ALL DEFENDANTS

51.     Plaintiffs reallege all paragraphs above as though fully set forth herein.

52.     The actions of the League and Perry described in this Complaint in barring C.K.M. from eligibility in varsity athletics were acting under color of state law and constituted violations of C.K.M.'s due process rights under the Fourteenth Amendment to the United States Constitution. These actions by the League and Perry also violated Minn. Stat. § 128C *et. al.* As a result of these violations, C.K.M. is entitled to relief pursuant to 42 U.S.C § 1983.

53.     Defendants maintain a policy or practice of determining varsity eligibility based on unpublished League interpretation and hearing decisions of the Bylaws functioned as a *de facto* rejection imposed upon C.K.M. and other students who transfer under the intolerable conditions exemption based on the sending schools employee conduct.

54.     Upon information and belief has not granted eligibility to students who transfer under the intolerable conditions exemption and has not granted the intolerable exemptions condition for students seeking transfer eligibility because of the conditions created by the sending school employees.

55.     The public has no notice that the Bylaws will be interpreted contrary to their clear and unambiguous meaning.

56.     The public has no meaningful and legitimate access to previous examples of League decisions or enforcement, such as past eligibility decisions, so as to have an understanding of League interpretation of its Bylaws.

57.     The League has the ability to publish its interpretations in its yearly eligibility brochure, but does not do so.

58.     The public has no notice of the standard for maintaining eligibility after transferring according to the Ineligibility Determination's interpretation that Bylaw 300.3(A) requires "exceptional circumstances" in order to be eligible.

59.     The public has no notice of the standard for maintaining eligibility after transferring according to the League's exemption related to intolerable conditions.

60.     The public has no notice of the standard for varsity eligibility after transferring under the intolerable conditions exemption.

61.     In short, the public has no notice that the Bylaws will be interpreted three different ways by the League throughout the course of appealing an ineligibility determination.

62.     Defendants' Bylaws are vague, confusing, time consuming without adequate due process to protect the rights of student athletes in a transfer eligibility request, appeal and hearing.  The Bylaws are applied in a punitive, overly restrictive and unavailing appeal process.

63.     The League is the sole entity responsible for writing and implementation of the Bylaws, and as a non-profit corporation receiving significant pecuniary gain from its member public schools, has a duty to design and implement Bylaws that comport with the student athletes' due process rights.

64.     Therefore the Defendants' actions, interpretations, and enforcement of the Bylaws as well as the wording of the Bylaws themselves constitute violations of C.K.M.'s due process rights under the Fourteenth Amendment to the United States Constitution. As a result of these violations, C.K.M. is entitled to relief pursuant to 42 U.S.C. § 1983.

65.     C.K.M. has a constitutionally protected property interest in being eligible to participate in varsity athletics.

66.     Defendants acted with recklessness or indifference to C.K.M.'s constitutional property right in education.

67.     C.K.M.'s constitutionally protected property interests have been taken away by Defendants.

68.     As a direct and proximate cause of the action or inactions of Defendants, C.K.M. has suffered significant social, emotional, and educational harm and has been damaged in an amount to be determined at trial.

69.     Plaintiffs are entitled to recovery of their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

70.     Plaintiffs therefore request and demand that an order issue compelling the League to allow C.K.M. to participate in varsity athletics and are entitled to monetary damages in an amount to be determined at trial.

## COUNT TWO

### BREACH OF CONTRACT
### DEFENDANT LEAGUE

71.     Plaintiffs reallege all paragraphs above as though fully set forth herein.

72.     A contract existed between C.K.M. and the League by virtue of C.K.M signing an

"Eligibility Statement" wherein C.K.M. and the League agreed to abide by the League's Bylaws.

73.     Plaintiffs have complied with every provision of the League's Bylaws.

74.     The League is the sole entity responsible for writing and implementation of the Bylaws,

and as a non-profit corporation has a contractual obligation to abide by its Bylaws.

75.     The League has failed or refused to comply with its own Bylaws in determining C.K.M.

to be ineligible and has thereby breached its duties under the contract with C.K.M.

76.     If the Court determines that the Bylaws are ambiguous, said ambiguity is to be

interpreted against the drafter, the League.

77.     Plaintiffs therefore request and demand that an order issue compelling the League to

allow C.K.M. to participate in varsity athletics and are entitled to monetary damages in an

amount to be determined at trial.

## COUNT THREE

### BREACH OF FIDUCIARY DUTY
### ALL DEFENDANTS

78.     Plaintiffs reallege all paragraphs above as though fully set forth herein

79.     The League has a contractual relationship with its member schools.

80.     C.K.M. is a third-party beneficiary of that contractual relationship, whose interest is the

ability to be eligible for varsity athletics. Defendants have a duty to C.K.M. to comply with the

League Bylaws concerning the eligibility of C.K.M. and other students.

81.     Defendants have failed or refused to comply with the League Bylaws in determining C.K.M. to be ineligible and this constitutes a breach of their fiduciary duties.

82.     Upon information and belief, it is common knowledge in the community that Defendants have failed or refused to comply with the League Bylaws in determining other student athletes' transfer eligibility rights.

83.     Upon information and belief, it is common knowledge in the community that Defendants have failed or refused to comply with the League Bylaws by granting transfer eligibility to other student and students who have sought an exemption.  Further, of the eight hearings for transfer eligibility, not one was granted by the League.

84.     As a direct and proximate cause of the Defendants breach of their duties, C.K.M. has been harmed.

85.     Plaintiffs therefore request and demand that an order issue compelling the League to grant C.K.M. eligibility to participate in varsity athletics.

86.     Plaintiffs further assert that they are entitled to monetary damages in an amount to be determined at trial.


## COUNT FOUR

### VIOLATIONS UNDER MINN. STAT. §§ 128C.03 AND 128C.05.
### ALL DEFENDANTS

87.     Plaintiffs reallege all paragraphs above as though fully set forth herein

88.     Minnesota Statute §§ 128C.03 and 128C.05 requires that the League "shall adopt procedures to ensure public notice of all eligibility rules …." and "shall adopt league rules and regulations governing the athletic participation of pupils attending school in a nonresident district under [Open Enrollment statute] 124D.03."

89.     In this case, the multiple unpublished interpretations by the League regarding the Bylaws directly violate this statute, as Plaintiffs had no notice the Bylaws regarding eligibility would be interpreted according to an unwritten and constantly shifting standard.

90.     Defendants had a duty to abide by this statute, and Plaintiffs had a reasonable expectation that Defendants would abide by this statute.

91.     As a direct and proximate result of violating this Plaintiffs have been injured.

92.     Plaintiffs therefore request and demand that an order issue compelling the League to allow C.K.M. to participate in varsity athletics and are entitled to monetary damages in an amount to be determined at trial.

## V.     RELIEF

Therefore, Plaintiff respectfully request that this Court:

1.     Exercise jurisdiction over this action;
2.     Declare that student athletes in Minnesota have a constitutionally protected right to be eligible to participate in varsity athletics;
3.     Declare that C.K.M. right to be eligible in varsity athletics was taken away by the Minnesota State High School League and Craig Perry;
4.     Declare that League Bylaws 111 and procedures are vague, arbitrary, and capricious, do not give the public adequate notice as to the deprivation of a constitutionally protected right, and the League's due process in constitutionally inadequate to protect the rights of student athletes;
5.     Declare that the Minnesota State High School League's enforcement of its Bylaws subject students to *de facto* ineligibility when they transfer because of intolerable conditions in the sending school or when the schools agree a student should be eligible in violation of those students' constitutional rights and permanently enjoin the Minnesota State High School League from this practice;
6.     Grant Plaintiffs' request for a Temporary Restraining Order preventing Defendants from denying C.K.M. transfer eligibility for varsity athletics at Maple Lake Public School and granting eligibility to C.K.M.to participate in varsity athletics;
7.     Issue a Preliminary Injunction preventing Defendant Minnesota State High School League denying C.K.M. from being eligible for varsity athletics at Maple Lake High School and granting eligibility to C.K.M. to participate in varsity athletics;
8.     Provide permanent injunctive relief, preventing Defendant Minnesota State High School League from denying C.K.M. transfer eligibility for varsity athletics at Maple Lake High School and granting eligibility to C.K.M. to participate in varsity athletics;

9.      Award compensatory damages against all Defendants, including costs and attorney's fees
        as appropriate, for all counts alleged above; and

10.     Provide such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**KANE EDUCATION LAW, LLC.**

Dated: December 12, 2016         /s/ Margaret O'Sullivan Kane
                                Margaret O'Sullivan Kane /ID # 220243
                                Attorney for Plaintiffs
                                420 Summit Avenue
                                Suite 306
                                Saint Paul, Minnesota 55102
                                Tel. 651.222.8611
                                Fax. 651.221.2623
                                mkane@kaneeducationlaw.com

**VERIFICATION**

I verify that I have read the foregoing Complaint, and that all of the facts and statements

made therein are true and correct to the best of my knowledge, as to the attached documents they

are true and correct copies, and as to those facts stated on information and belief, I also believe

them to be true and correct.

Dated:_____        _____
                                     Rhonda Maki

Subscribed and sworn to before me
this ____ day of December 2016.

_____
Notary Public

24